George S. Trevor (Bar No. 127875)
LAW OFFICES OF GEORGE S. TREVOR
300 Tamal Plaza, Suite 180
Corte Madera, California 94925
Telephone:  (415) 924-7147
Facsimile:  (415) 924-7159

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DR. AJAY SINGHAL,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>MENTOR GRAPHICS CORPORATION,<br><br>　　　　　Defendants. | CASE NO. C07-01587-JSW<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**<br><br>**Jury Trial Demanded** |

### INTRODUCTION

1.　Plaintiff Dr. Ajay Singhal brings this action is for theft of intellectual property, correction of inventorship, declaratory judgment of inventorship, breach of implied contract, negligent and intentional misrepresentation, employment discrimination, wrongful termination and wrongful deprivation of rights under certain patents applied for by defendant Mentor Graphics.

2.　Plaintiff is a 38 year old naturalized U. S. citizen.  Dr. Singhal received his Masters of Science in Engineering from the University of Texas in 1992 and his Ph.D. in Engineering from the University of Illinois in 1996.  He has over eleven years experience in semiconductor device fabrication and manufacturing with five international patents to his credit in his field.

3.　This lawsuit arises from work he performed before and during his employment by defendant Mentor Graphics Corporation ("Defendant" or "Mentor").  As a result of Mentor's acts as

alleged below plaintiff has been deprived of significant reputation and career growth, business and economic earnings in his field and his rights and interest in certain patents that defendant has claimed ownership.

## JURISDICTION AND VENUE

4. This action is brought pursuant to 35 U.S.C. sections 102, 116 and 256 for deceptive intent in a patent application, correction of patent application and/or correction of patent ownership, Title VII of the Civil Rights Act of 1964 and certain state law claims. Jurisdiction is conferred on this Court under 42 U.S.C. section 2000e-5, 28 U.S.C. section 1331, 28 U.S.C. section 1338 and 28 U.S.C. section 1343.

5. Venue is appropriate in this district since defendant has significant business operations in this district with an office located in San Jose, California and Plaintiff resides in Fremont, California. Moreover, many of the acts complained of herein took place in the Northern District of California.

6. Plaintiff's state law claims arise under the supplemental jurisdiction of this Court pursuant to 28 U.S.C. section 1367 since those claims are related to and based upon the same facts and circumstances as claims arising under the original jurisdiction of this court.

## PARTIES

**Plaintiff**

7. Dr Ajay Singhal is a Ph.D. in Engineering with significant experience in semiconductor device, fabrication and manufacturing. Plaintiff resides in Fremont, California.

**Defendant**

8. Mentor Graphics is a State of Oregon corporation qualified to and doing business in the State of California. Mentor's principal place of business is in Oregon.

## FACTUAL ALLEGATIONS

9. Plaintiff was hired pursuant to a written offer of employment by Defendant on September 29, 2003. Plaintiff was hired as a Senior OPC Consultant with a salary of $126,000 a year plus bonus. Prior to his employment at Mentor Plaintiff had been working on various design issues relating to the manufacturing of semiconductors while self-employed.

10. Prior to September 29, 2003, Plaintiff completed extensive work on what is referred to as the important new field of "Design for Manufacturing." ("DFM")  This work was performed between the time Dr. Singhal left his previous employer and before he joined Mentor.  During this time Plaintiff also worked at the Computer Engineering Research Center at the University of Texas, Austin as a Research Fellow.  Among the many papers evidencing his work on DFM methods is a PowerPoint presentation describing the ideas he later disclosed to Mentor.  Plaintiff prepared this presentation prior to his employment by Mentor.  During the five months prior to Plaintiffs' employment at Mentor, he was also working on a book for McGraw-Hill on the novel ideas he had developed concerning DFM methods.

11. After his employment by Mentor Plaintiff continued to refine DFM methods he had conceived prior to his employment.  On February 29, 2004 Plaintiff prepared a detailed disclosure of the novel ideas he had developed in the DFM field.  On March 5, 2004, Plaintiff emailed to Mark Porter, Mentor's in-house patent counsel, Mentor's approved form for requesting a patent application.  Plaintiff also sent a copy of this form to Larry Specter, one of his superiors and his hiring director in the Consulting Division.  Around this same time Plaintiff had also emailed to Mr. Specter an eleven page PowerPoint presentation that expanded on the invention disclosed to Mark Porter on March 5, 2004.  Mr. Specter called Plaintiff shortly thereafter to advise him that the PowerPoint had been forwarded to Mr. Porter.  Over the next week and continuing throughout the rest of 2004 and 2005 until his termination by Mentor on June 15, 2005, Plaintiff sent numerous follow-up emails to Mark Porter, Larry Specter, Bill Martin, Paul Hofstadler, Charlie Albertalli, Bill Berg, Chris McGinty, John Sturtevant, Joseph Sawicki and Scott Thompson, his immediate supervisor at Mentor.  Based upon other emails Plaintiffs subsequently has sent, at least some of these emails were forwarded to Scott Thompson and on July 13, 2004 Plaintiff sent copies of his earlier emails to Charlie Albertalli, Marketing Director who works closely with Mentor's Design-to-Silicon engineering division.  These mails repeatedly requested information on the patent application for his invention disclosed to Mark Porter on March 5, 2004.  Mr. Porter did not respond to those inquiries.  Throughout 2004 and into 2005, Scott Thompson promised to arrange a conference call with Mark Porter but that call never took place.

12. Instead on March 26, 2004, Larry Specter sent a memorandum to Plaintiff alleging

1  unsatisfactory job performance over the previous several months even though Mentor had confined
2  Plaintiff to work in his home office from January 2004 to March 28, 2004.  This memorandum was a
3  follow-up to letter of reprimand sent to Plaintiff on March 9, 2004, four days after he had made his
4  disclosures to Mark Porter and Larry Specter.  Plaintiff disputed these allegations and based upon
5  information subsequently acquired alleges that Mr. Specter's allegations and after Mr. Specter left
6  Mentor in July 2004 similar allegations by Scott Thompson were for the purpose of discouraging
7  Plaintiff from pursuing his claims of ownership of the novel DFM methods he had disclosed to Mr.
8  Specter and Mark Porter on March 4 and March 5, 2004.

9  　　　　13.　　Unbeknownst to Plaintiff at the time, Mentor submitted on April 19, 2004 patent
10 application No. 10/827,990 to the United States Patent and Trademark Office ("USPTO").  This
11 application used the ideas and inventions developed by Plaintiff with respect to DFM methods but failed
12 to attribute Plaintiff as the inventor.  Instead, Joseph Sawicki and other Mentor employees were listed on
13 the application as co-inventors.  On September 29, 2004, Mentor submitted a second patent application,
14 No. 10/951,710, also based upon the ideas developed and submitted by Plaintiff to Mentor's patent
15 counsel and to other responsible parties at Mentor.  As with the first application, Mentor failed to list
16 Plaintiff as the inventor of these ideas.  Applications for patents were also submitted to the World
17 Intellectual Property Organization and in Europe, Taiwan and India.

18 　　　　14.　　Plaintiff continued through the rest of 2004 performing his consulting work on behalf of
19 Mentor for its client IBM.  Despite Larry Specter and Scott Thompson's contrary evaluations, IBM
20 expressed at all times its complete satisfaction with Plaintiff's work.  After hearing nothing on the status
21 of his patent applications for his valuable DFM ideas, Plaintiff emailed Mark Porter, Joseph Sawicki,
22 Bill Berg, Scott Thompson and Paul Hofstadler, all high level Mentor executives, on June 1, 2005
23 asking about the status of his now over a year old patent disclosure.  Moreover, back on July 13, 2004
24 when he emailed Charlie Albertalli about his DFM ideas, Mr. Albertalli had told him in a subsequent
25 telephone conversation that the ideas had value and Plaintiff would be contacted.  Plaintiff continued his
26 enquiries on his patent disclosures throughout 2004 and through June 1, 2005 via emails, telephone calls
27 and voicemails to Mark Porter, Scott Thompson, Bill Berg and other Mentor executives.  Fifteen days
28 after his further email inquiry of June 1, 2005, Mentor terminated his employment immediately.

Case No.  C07-01587-JSW

FIRST AMENDED COMPLAINT

- 4 -

15. Plaintiff subsequently discovered that in May 2005 Mentor had filed two additional patent applications that incorporated his DFM ideas with the USPTO. These patents, Application No. 11/123,340 filed on May 6, 2005 and application No. 11/126,069 filed on May 9, 2005, also failed to identify Plaintiff as the inventor and instead listed other Mentor employees as inventors. In fact, Plaintiff's patent disclosures in March 2004 had been the first to use the term "overlay" which Andres Torres, the first listed inventor on Application No. 11/123,340, had not used in the DFM context until July 2004. Charlie Albertalli, Mr. Torres' boss at Mentor, was aware in July 2004 of Plaintiffs earlier use of this concept and his email and telephonic objections to Charlie Albertalli, Chris McGinty, Scott Thompson and John Sturtevant of Mr. Torres' use of the concept without attribution. On information and belief, Plaintiff alleges that Mentor has filed additional patent applications incorporating the ideas and concepts conceived by Plaintiff without any attribution of Plaintiff's inventorship.

16. Plaintiff, on information and belief, was the victim of repeated false accusations about his work performance and dealings with Mentor's customers. This pattern of behavior commenced soon after Plaintiffs' hiring and accelerated after he made his patent disclosures to Mark Porter on March 5, 2004. On March 9, 2004, Scott Thompson demanded that Plaintiff immediately sign a "reprimand letter" admitting that he had entered a customers' facility (IBM) without a badge even though there was clear evidence that IBM had insisted he go to the facility at once to answer certain critical questions. On March 26, 2004, Larry Specter made false and misleading accusations regarding Plaintiff's work with Mentor's customer IBM. Other acts of retaliation and false accusations as to Plaintiff's job performance continued after March 26, 2007. For example, in a listing of a paper and presentation to be made at a conference on DFM to be held from February 27 through March 4, 2005, Plaintiff was originally listed as one of the co-authors and co-presenters of a paper entitled "Assessing the Impact of Real-World Lithography Variations in Design for Manufacturing." At the conference Mentor unilaterally struck Plaintiffs name as a co-author.

**FIRST CLAIM FOR RELIEF**
**(Discrimination**

17. Plaintiff realleges and incorporates the allegations set forth in paragraphs 1 through 16 above.

Case No. C07-01587-JSW

FIRST AMENDED COMPLAINT

- 5 -

18. The acts of Defendant in terminating Plaintiffs' employment on June 15, 2005, were discriminatory based upon Plaintiffs race and national origin. Despite numerous customers and peers at Mentor attesting to Plaintiff's contributions, Mentor executives from March 9 2004 through June 15, 2005 repeatedly described his performance as unsatisfactory. On information and belief Plaintiff alleges that the basis for such conduct by Mentor was by race and/or national origin.

19. On or about March 2, 2006 Plaintiff filed a complaint with the California Department of Fair Employment and Housing ("DFEH") regarding Defendant's alleged discriminatory conduct. On or about March 21, 2006, the DFEH issued a Notice-of-Right-to-Sue letter.

20. As a result of such conduct by Defendant, Plaintiff prays for the relief set forth at the end of his complaint.

**SECOND CLAIM FOR RELIEF**
(Correction of Inventorship, 35 U.S.C. sections 102, 116 and 256)

21. Plaintiff realleges and incorporates the allegations set forth in paragraphs 1 through 20 above.

22. Plaintiff requests that under the equitable powers invested in this court, the identity of the inventor on patent application Nos. 10/827,990, 10/951,710, 11/123,340 and 11/126,069 be found to include Plaintiff as the inventor of the ideas expressed in those patents and/or patent applications. Plaintiff believes that Mentor has filed additional patent applications that incorporate Plaintiff's ideas and inventions as disclosed to Mentor on March 4 and 5, 2004.

23. As alleged above, Plaintiff was the first inventor of certain ideas set forth in the applications for the above listed patents. Mentor was aware of this fact at least by March 4, 2004 and at all times thereafter and filed patent applications that were deceptive as to the identity of the actual inventor of methods set forth in those applications.

**THIRD CLAIM FOR RELIEF**
(Negligent and/or Intentional Misrepresentation)

24. Plaintiff realleges and incorporates the allegations set forth in paragraphs 1 through 24 above.

25. Mentor, through its employees, made misrepresentations and/or omissions of material

facts to plaintiff, the USPTO and others. Such statements include, but are not limited to, Plaintiff's contribution to and conception of certain ideas incorporated into patent applications filed on behalf of Mentor. Defendant also made false and misleading statements regarding Plaintiff's job performance and work history.

26. At the time Defendant made these false statements, Defendant knew such statements were false, recklessly disregarded the truth or falsity of such statements or acted without any reasonable grounds for believing the statements were true and by such acts intended that Plaintiff and others rely on such statements and Plaintiff did rely on such statements.

27. As a direct and proximate result of the material false and misleading statements made by Defendant, Plaintiff has suffered significant harm to his professional reputation and career progress, been denied business and economic earning in this field and been denied the benefits of being the sole inventor or co-inventor of certain valuable patents including significant economic damages for the wrongful deprivation of his rights and interests in certain patents.

28. The conduct of defendant as alleged above was done purposely with the intent to deceive and without regard for the rights and interests of Plaintiff, thereby entitling Plaintiff to an award of punitive damages in amount sufficient to deter the wrongful conduct of defendant.

**FOURTH CLAIM FOR RELIEF**
(Breach of Implied Contract)

29. Plaintiff realleges and incorporates the allegations set forth in paragraphs 1 through 28 above.

30. At the time Plaintiff accepted an offer or employment with Mentor, Mentor, through Larry Specter and other Mentor employees, made certain representations and assertions to Plaintiff. Among those promises was that Plaintiff would perform certain consulting duties for Mentor's customers and would also be allowed to continue his work on DFM methods after September 29, 2003, that within 12 to 18 months would be promoted and that Plaintiff would be compensated for the ideas he developed on the subject of DFM.

31. Larry Specter and Matt Sutter (Mentor's Human Resources representative) also promised a lodging and relocation bonus that would continue throughout his employment at Mentor. Instead,

1  Mentor stopped the payment of such bonus early in 2005 and also made Plaintiff pay for his relocation
2  from New York to San Jose.

3       32.    In consideration of such offers by Mentor, Plaintiff accepted the offer of employment
4  from Mentor and became a full time employee on September 29, 2003.  Because of Mentor's job
5  requirements, Plaintiff had to move his family with young children twice during his time at Mentor.

6       33.    As a result of such promises by Mentor an implied contract as to the terms of his
7  employment was created including the implied covenant of good faith and fair dealing.  The acts of
8  Mentor subsequent of September 29, 2003 have breached the implied contract between Plaintiff and
9  Defendant including the covenant of good faith and fair dealing.

10      34.    As a direct and proximate result of Defendant's breach, Plaintiff has suffered damages in
11 an amount to be determined.

## FIFTH CLAIM FOR RELIEF
(Wrongful Termination

13      35.    Plaintiff realleges and incorporates the allegations set forth in paragraphs 1 through 34
14 above.

15      36.    Defendant's discharge of plaintiff on June 15, 2005 violated well-established public
16 policy which was clearly delineated in codified laws and regulations and which was sufficiently clear at
17 the time of the discharge.  Specifically, and without limitation, defendants' discharge of plaintiff was
18 motivated by defendants' desire to avoid identifying plaintiff for the unique and novel ideas he had
19 developed with respect to DFM methods.  When Plaintiff again complained about the status of his patent
20 disclosures on June 1, 2005, Defendant fired Plaintiff in retaliation for that complaint and other acts.

21      37.    Defendants' termination of plaintiff from employment was intended to avoid listing
22 Plaintiff as the inventor of certain patents.  At the time of Plaintiff's discharge, Mentor was aware of the
23 value of Plaintiff's ideas and Mentor was incorporating such ideas into certain products.  Thus,
24 Defendant violated public policy by discharging Plaintiff for the assertion of legal rights as to the
25 ownership of these patents.

26      38.    As a direct and proximate result of Defendant's wrongful discharge of Plaintiff, Plaintiff
27 has suffered, and continues to suffer, significant losses in career growth and reputation, earnings and
28 other employment benefits as well as emotional distress in an amount to be established at trial, and

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand that judgment be rendered in favor of Plaintiffs and the class against Defendants as follows:

1. For compensatory and general damages according to proof;
2. For special damages according to proof;
3. For equitable relief as to Plaintiff's claim for correction of inventorship;
4. For prejudgment interest at the maximum legal rate;
5. For punitive and exemplary damages according to proof;
6. For the costs of the proceedings herein;
7. For Plaintiffs' reasonable attorneys' fees; and
8. For all such other and further relief as the Court deems just.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action as to all claims sounding in law.

## CIVIL LOCAL RULE 3-16 CERTIFICATION

Pursuant to Northern District of California Civil Local Rule 3-16, Plaintiffs certify that as of this date, other than the named Plaintiff, there is no such interest to report.

July 13, 2007

LAW OFFICES OF GEORGE S. TREVOR

By: _____
GEORGE S. TREVOR
Attorneys for Plaintiffs

Case No. C07-01587-JSW

FIRST AMENDED COMPLAINT

- 9 -